# 24-2032-CR

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

➤➤◄◄

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

EDMEE CHAVANNES, AKA SEALED DEFENDANT 2,

*Defendant,*

BEVELYN BEATTY WILLIAMS, AKA SEALED DEFENDANT 1,

*Defendant-Appellant.*

_____

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF FOR DEFENDANT-APPELLANT

Florian Miedel
MIEDEL & MYSLIWIEC, LLP
*Attorneys for Defendant-Appellant*
52 Duane Street, 7th Floor
New York, New York 10007
212-616-3042



# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

STATEMENT PURSUANT TO FED. R. APP. P. 28(a)(4) ...................................1

STATEMENT OF ISSUES PURSUANT TO FED. R. APP. P. 28(a)(5)................2

STATEMENT OF THE CASE...........................................................................3

STATEMENT OF FACTS ................................................................................4

    A. Arrest and Pretrial Motions ........................................................5

    B. Trial ...........................................................................................7

        1. Protests at the Manhattan Planned Parenthood Clinic .........8

        2. Other Protests ...............................................................16

        3. Verdict .........................................................................16

    C. Sentencing .................................................................................16

SUMMARY OF ARGUMENT ........................................................................19

ARGUMENT .................................................................................................22

    POINT I: The Trial Court Erred When It Denied Appellant's Request for a First Amendment Jury Instruction and Denied Appellant's Request to Make First Amendment Based Arguments to the Jury ...............................................................................22

    A. Standard of Review ....................................................................23

    B. Applicable Law .........................................................................24

    C. Discussion .................................................................................25

    POINT II: Section (a)(1) of the FACE Act Is Unconstitutional In Light Of Recent Intervening Supreme Court Precedent .........................34

    A. Standard of Review ....................................................................36

    B. After *Dobbs*, the FACE Act Can No Longer be Sustained as a Lawful Exercise of Federal Government Authority Under Section 5 of the 14th Amendment ...............................................................................36

i

C. § 248(a)(1) of the FACE Act Cannot be Sustained as a Lawful Exercise of Federal Government Authority Under the Commerce Clause Pursuant to *United States v. Morrison* ....................................38

D. Even if Congress has the Authority under the Commerce Clause to Enact the FACE Act, it is a Content-Based Regulation of Speech that No Longer Survives Scrutiny After *Dobbs*..........................................41

POINT III:    Appellant's 41-Month Custodial Sentence Was Substantively Unreasonable...............................................................................46

CONCLUSION ...........................................................................................................55

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS CONCLUSION ...........................................................................................................56

ii

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) ....... *passim.*

*Jingrong v. Chinese Anti-Cult World Alliance Inc.*, 16 F.4th 47 (2d Cir. 2021)......38

*McCullen v. Coakley*, 573 U.S. 464 (2014) .................................................35, 43, 45

*New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184 (2d Cir. 2001)

...................................................................................................................28, 29

*New York ex rel. Underwood v. Griepp*, 991 F.3d 81 (2d Cir. 2021), *vacated on*

*other grounds* 11 F.4th 174 (2d Cir. 2021)....................................................45

*New York by James v. Griepp*, 11 F.4th 174 (2d. Cir. 2021)..............................45, 46

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ................................................41, 42

*Reed v. Town of Gilbert,* 576 U.S. 155 (2015) ...........................................35, 43, 45

*Roe v. Wade*, 410 U.S. 113 (1973)..............................................................................4

*United States v. Alvarez*, 567 U.S. 709 (2012) .......................................................27

*United States v. Avenatti*, 81 F.4th 171 (2d Cir. 2023)............................................24

*United States v. Broxmeyer*, 699 F.3d 265 (2d Cir. 2012).....................................46

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) ....................................47, 54

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) ...........................................46

*United States v. DiMassa*, 117 F.4th 477 (2d Cir. 2024)........................................53

*United States v. El-Mezain*, 664 F.3d 467 (5th Cir. 2011) ....................................33

*United States v. Fleschner*, 98 F.3d 155 (4th Cir. 1996)..................................24, 34

*United States v. Freeman*, 761 F.2d 549 (9th Cir. 1985)..................................24, 34

*United States v. Gallagher*, 22-Cr-327 (M.D. Tenn. 2022)..............................49, 50

*United States v. Handy*, No. 22-CR-096 (D.C. District Ct. 2024) ........18, 47, 48, 49

*United States v. Hassan*, 742 F.3d 104 (4th Cir. 2014) ........................................33

*United States v. Heineman*, 767 F.3d 970 (10th Cir. 2014)...................................29

*United States v. Hill*, 893 F. Supp. 1034 (N.D. Fl. 1994)........................................48

*United States v. Hunt*, 573 F.Supp.3d 779 (E.D.N.Y. 2021)...........................29, 34

*United States v. Hunt*, 82 F.4th 129 (2d Cir. 2023) ......................................28, 29

*United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976) ..........................................28

*United States v. Lopez*, 514 U.S. 549 (1995)......................................38, 39, 40, 41

*United States v. Morrison*, 529 U.S. 598 (2000) ...........................35, 38, 39, 40, 41

*United States v. Moscinski*, 22-CR-485 (E.D.N.Y. 2022) ...............................49, 50

*United States v. O'Brien*, 391 U.S. 367 (1968) ...................................................35, 42

*United States v. Paul*, 110 F.3d 869 (2d Cir. 1997)................................................24

*United States v. Pugh*, 945 F.3d 9 (2d Cir. 2019).............................................46, 50

*United States v. Singh*, 877 F.3d 107 (2d Cir. 2017) .............................................46

*United States v. Sryniawski*, 48 F.4th 583 (8th Cir. 2022) ...................................30

*United States v. Waagner*, 2014 WL 2710953 (E.D. Pa. 2014) ............................48

*United States v. Weslin*, 156 F.3d 292 (2d Cir. 1998) ................................. *passim.*

*United States v. Wilkerson,* 361 F.3d 717 (2d Cir. 2004)........................................36

*United States v. Williams*, 701 F. Supp. 3d 257 (S.D.N.Y. 2023)......................3, 35

*United States v. Yung*, 37 F.4th 70 (3d Cir. 2022)..................................................30

*United States v. Zhong*, 26 F.4th 536 (2d Cir. 2022)...............................................23

*Virginia v. Black*, 538 U.S. 343 (2003) ............................................................29, 30

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)...............................................43

*Zarnel v. Zarnel*, 619 F.3d 156 (2d Cir. 2010) ......................................................36

**Legislative Hist.**

H.R. Rep. 103-306, October 22, 1993, 1993 WL 465093 ......................................32

H.R. Conf. Rep. 103-488, May 2, 1994, 1994 WL 168882 ...................................36

S. Rep. 103-117, 1993 WL 286699, July 29, 1993 ...........................................37, 44

**Statutes**

18 U.S.C. § 248(a)(1) ................................................................... *passim.*

18 U.S.C. § 248(a)(2) ...............................................................38

18 U.S.C. § 248(d)(1) ...........................................................19, 32

18 U.S.C. § 2339A ................................................................34

18 U.S.C. § 2339B(i) ............................................................33

18 U.S.C. § 3231 ...................................................................1

28 U.S.C. § 1291 ...................................................................1

U.S. Const. amend. I ............................................................. *passim.*

U.S. Const. amend. XIV ......................................................20, 21, 36, 37

v

## STATEMENT PURSUANT TO FED. R. APP. P. 28(a)(4)

This is an appeal from a final judgment of the United States District Court for the Southern District of New York (Jennifer L. Rochon, J.), entered July 24, 2024, convicting Appellant Bevelyn Williams, after jury trial under indictment 22-Cr-684 (JLR), of one count of violating the Freedom of Access to Clinics Entrances ("FACE") Act, in violation of 18 U.S.C. § 248(a)(1). Jurisdiction in the District Court was pursuant to 18 U.S.C. § 3231. A Notice of Appeal was timely filed in the District Court on July 30, 2024. Jurisdiction in this Court is conferred by 28 U.S.C. § 1291.

1

## <u>STATEMENT OF ISSUES PURSUANT TO FED. R. APP. P. 28(a)(5)</u>

This appeal presents the following issues to be determined by this Court:

I.      Did the District Court err when it denied the defense request to provide the jury with a First Amendment instruction, and when it precluded the defense from arguing that Appellant's speech and conduct were protected by the First Amendment?

II.     Is the 18 U.S.C. § 248(a)(1) (the FACE Act) unconstitutional in light of recent Supreme Court precedent?

III.    Was Appellant's sentence of 41 months substantively unreasonable?

It is respectfully submitted that each of the above questions should be answered in the affirmative.

## STATEMENT OF THE CASE

Appellant Bevelyn Williams was convicted, after jury trial, of one count of violating the FACE Act, in violation of 18 U.S.C. § 248(a)(1). She was acquitted of conspiracy to violate the FACE Act. On July 24, 2024, District Court Judge Jennifer L. Rochon sentenced Ms. Williams to a term of 41 months in the custody of the Bureau of Prisons, to be followed by a two-year term of supervised release. The Court did not order a fine or restitution but directed Ms. Williams to pay a $100 special assessment. A timely notice of appeal was filed on July 30, 2024. Appellant is currently serving her sentence pursuant to the judgment.

Ms. Williams appeals from the judgment of conviction entered on July 24, 2024, which includes a written decision issued by the District Court in *United States v. Williams*, 701 F. Supp. 3d 257, 261 (S.D.N.Y. 2023).

**STATEMENT OF FACTS**

The conduct for which Appellant Bevelyn Williams was convicted occurred in June 2020 when she and her trial co-defendant Edmee Chavannes engaged in two days of "pro-life" protests at a Manhattan Planned Parenthood clinic. A. 24-A. 26. During the protests, Ms. Williams stood outside the clinic on a public sidewalk while loudly proclaiming her anti-abortion views, shouting Biblical phrases, and singing religious songs. *See e.g.*, A. 391. At one point, after a clinic employee aggressively pulled open the front door of the clinic against Ms. Williams, she pushed the door back, catching the employee's hand in the door. A. 665. New York City Police officers were on the scene during the protests, yet neither the employee nor any of her colleagues, including the clinic's Security Director, ever made a complaint to the NYPD at that time or in the two years afterwards. *See generally* A. 403-A. 422, A. 486-A. 542, and A. 623-A. 750. Nor was there evidence presented that federal law enforcement agents or prosecutors sought to investigate the incident during those years. *Id.*

All that changed when the Supreme Court issued its decision in *Dobbs v. Jackson Women's Health Organization,* 597 U.S. 215 (2022) ("*Dobbs*") overturning *Roe v. Wade*. In the wake of *Dobbs*, the two-year-old protest incident that had not generated a criminal complaint suddenly became "serious conduct," deserving of federal prosecution under the FACE Act. A. 1276.

4

A. <u>Arrest and Pretrial Motions</u>

About six months after *Dobbs*, on December 13, 2022, Ms. Williams and Ms. Chavannes were charged in a three-count indictment with conspiracy to violate the FACE Act (Count 1) and two substantive charges for FACE Act violations (Counts 2 & 3). *See* 18 U.S.C. § 248(a)(1); A. 23-A. 33. The conspiracy charge alleged that from 2019 to 2022, Appellant and Chavannes engaged in demonstrations in several states with intent to violate the FACE Act. *Id*. The substantive counts against Appellant and Chavannes were based only on the two-day protest at the Manhattan Planned Parenthood, occurring June 19-20, 2020. A. 24-A. 26. Count 2 specifically charged Ms. Williams with injuring a Planned Parenthood employee with intent to violate the FACE Act. A. 30-A. 31.

As part of her pretrial Rule 12 motions, Ms. Williams moved to dismiss the indictment. A. 34-A. 60. Ms. Williams argued that *Dobbs* changed the legal landscape supporting the FACE Act, since there was no longer a compelling – or even a substantial – federal government interest in protecting access to abortion. A. 47-A. 60. As such, Ms. Williams argued that the FACE Act could no longer survive constitutional scrutiny. *Id*. The District Court denied the motion, relying primarily, though not exclusively, on binding precedent from this Court. A. 94-A. 117.

As part of her proposed requests to charge, Ms. Williams asked for a jury instruction to define the parameters of the First Amendment in the context of this case for the jury. A. 136-A. 137. The government opposed that request and also filed a *motion in limine* to preclude the defense from arguing to the jury that Ms. Williams was "engaged in a lawful expression of [her] personal beliefs—whether political, religious, or social—and that the Government has charged [her] with offenses for engaging in conduct that is protected by either the Free Speech Clause or Free Exercise Clause of the First Amendment." A. 201-A. 202.

Ms. Williams contended that the ultimate jury determination in the case would come down to whether her specific speech and actions were constitutionally protected or crossed the line into criminality. A. 221-A. 225. She argued that just as "juries are not assumed to know and be familiar with all of the permutations of the burden of proof in criminal cases, the presumption of innocence, the right to remain silent, or any of the other constitutional rights that judges explain to juries in charging instructions . . . jurors cannot be presumed to know the range of expression permitted by the First Amendment." A. 224. Therefore, "[i]n the absence of a jury instruction on the First Amendment or the defense referencing the First Amendment, there is a danger that a juror could conclude that there is no lawful reason for a person to angrily shout violent-sounding words at other people and to stand close to those other people when doing it." A. 222. Ms. Williams's

6

counsel further observed that "we can't assume that they understand what the First Amendment means or says. So an instruction I think would be helpful to the jury so that we could avoid the confusion from different jurors, if it happens, expressing contrary views or views that actually confuse the ultimate issue here, as opposed to clarifying it." A. 293.

The District Court denied Ms. Williams's request to instruct the jury on the First Amendment. *Id.*; *see also* A. 1008-A. 1009. The Court also largely granted the government's *motion in limine*, ruling that Ms. Williams could not argue to the jury that her "actions were aligned with the First Amendment." A. 293. Relying on its previous ruling denying Appellant's motion to dismiss and finding that the FACE Act passed constitutional muster, the District Court determined that First Amendment arguments played no role at the trial. A. 295.

B. Trial

On February 12, 2024, Ms. Williams and Ms. Chavannes proceeded to trial. The government presented evidence regarding the conspiracy count and the substantive counts. The government's evidence on the conspiracy count started with the two-day protest at the Manhattan Planned Parenthood clinic and then included evidence regarding other protests in Florida, Georgia, and Tennessee. The

evidence for the substantive counts related to the specific two-day protest at the Manhattan clinic.

    I.       *Protests at the Manhattan Planned Parenthood Clinic*

On February 14, 2024, Planned Parenthood Director of Security, Ron Lyman, testified as the government's first witness. A. 403. He testified that in June 2020, he worked at a Planned Parenthood located at 26 Bleeker Street in Manhattan. A. 405. He worked in person 5 or 6 days a week and was present at the protests on June 19th and June 20th. *Id.* He testified that he knew Williams and Chavannes because they had protested at this location before. A. 406-A. 407. *See also* A. 532. In fact, before June 2020, Mr. Lyman had seen Appellant and Chavannes conducting weekly demonstrations at the location about 25 times. *Id.* He confirmed the Planned Parenthood staff knew Appellant and Chavannes by name and were familiar with their manner of protesting, which included loud and angry shouting. A. 406.

Neither Ms. Williams nor Ms. Chavannes was arrested at any of those prior protests and there was no allegation at trial that either of them ever violated the FACE Act or a state criminal statue when they engaged in them. *See e.g.*, A. 467. Appellant and Chavannes and other pro-life protestors publicized in advance the dates for all of the protests. A. 416. *See also* A. 522, A. 533. On prior occasions,

barricades (in the form of metal fencing) were rarely present at the clinic and counter-protestors were not frequent. A. 532-A. 533.

Mr. Lyman demonstrated his familiarity with the clinic's campus by identifying different entrances, security policies, and locations of security cameras. A. 408-A. 415; Exhibits 361-366. The government also admitted Exhibits 156 and 158 into evidence as samples of the security footage Mr. Lyman obtained from the protests. A. 416.

Mr. Lyman testified that NYPD Officers were on the scene during parts of both days of the June 2020 Planned Parenthood protest. A. 515, A. 525. Planned Parenthood security also "had at least a week to two weeks' notice" of the June 2020 protests, because Ms. Williams and Ms. Chavannes advertised the events on social media. A. 416. Mr. Lyman admitted that Planned Parenthood staff created a different protest environment for the June 19th-20th protests than had existed on prior dates. A. 532-A. 533. Since staff were aware of the protest in advance and expected it to have a larger number of pro-life protestors than normal (A. 416. *See also* A. 522, A. 533) they recruited many "counter-protestors" to be present. A. 523. Planned Parenthood staff were trained to deal with protesters, but neither Mr. Lyman nor his security staff had trained the counter-protestors to do so. A. 521.

During the June 19-20 protests, counter-protestors were often positioned on the sidewalk right in front of two entrances to the Planned Parenthood, sometimes

9

in a wall type formation, sometimes surrounding Ms. Williams while raising sharp, pointed umbrellas in their hands, and sometimes standing inside a funnel of barriers placed in front of the main entrance to narrow the path to that doorway. A. 534-A. 535. *See also* GX 158. Ms. Williams and Ms. Chavannes also were sometimes positioned on the sidewalk in front of one or the other of the entrances. *See generally* A. 403-A. 422, A. 486-A. 542.

As part of the evidence relating to the Manhattan Planned Parenthood protests, the government also called Lauren Betters. A. 420, A. 423. In June 2020, Ms. Betters was an independent volunteer observer assigned to the Manhattan Planned Parenthood to take photos, videos, and notes of the unfolding protests. A. 424-A. 425. She did not have any contact with Planned Parenthood staff. *Id*. She was in attendance for both days of the protest. A. 426, A. 440.

On direct examination, Ms. Betters was asked about various photographs she took during the June 19-20 protests, including of Ms. Williams and Ms. Chavannes.  Trial Exhibits 371-385. A. 428. She was also asked to consider additional video that she, herself, recorded, admitted as Exhibits 121, 122, 125, 181, 183, 184, 187, and 188. A. 431. She further reviewed notes she had recorded on those days, including one that read that Appellant was "scream[ing] in [the] face" of patients attempting to enter the clinic.

10

Ms. Betters arrived around 7:00 a.m. on June 19, 2020. A. 426. When she arrived, she noted that barricades were already in place on either side of the door, and "there was a clinic escort located right near the door, and then there were two clinic escorts standing at the entrance of the barricades." A. 427. She observed Ms. Williams's and Ms. Chavannes's arrival just minutes later. *Id.* She recalled that both women remained in the vicinity of the main clinic entrance and were "being very vocal" and "yelling." A. 428.

Ms. Betters arrived around the same time on June 20, 2020. A. 440. In addition to Ms. Williams and Ms. Chavannes, who were stationed in front of the main door, she noted the presence of counter-protesters, unlike the day before. A. 440-A. 442. The barricades were up when she first arrived, but NYPD Officers removed them within 10-15 minutes of her arrival. *Id.* She recalled that it was almost as if counter-protesters took their place: "[the main door is] flanked with the counter-protesters sort of acting as human barricades on either side of the door" A. 443. According to Ms. Betters, on this day, Appellant and Chavannes directed protesters towards the clinic's side door, as well. A. 447.

Ms. Betters confirmed that the area in front of the Planned Parenthood is a public sidewalk. A. 439. On cross-examination, Ms. Betters reviewed a video in evidence as Exhibit 125. In the video, NYPD Officers intervened to dissolve a verbal altercation between Chavannes and another person. A. 464-A. 467. The

11

Officers directed Chavannes to an area away from the entrance to have a conversation with them. *Id*. Minutes later, the police allowed Chavannes back into the area of the main clinic entrance to continue protesting. *Id.* While Ms. Betters characterized Appellant's and Chavannes conduct as "obstruction" of the entrance to the clinic, she also admitted that patients and/or staff members entered through the front door of the clinic during the course of the protests. *See e.g.,* A. 468. *See also* GX 121.

On the second day of trial, the government called Adrienne Verrilli, the former vice president for communications and marketing at Planned Parenthood of Greater New York. A. 623. She was present at the Manhattan health center on both June 19th and June 20th of 2020 and served as a clinic escort on both days. A. 625-A. 626.

On direct examination, the government asked Ms. Verrilli to describe two specific events from her escorting duties on those days. One event occurred on June 19th, when Ms. Verrilli was involved in a close, verbal confrontation with Chavannes. A. 626-A. 627. This confrontation was the same one that Ms. Betters testified about during which NYPD Officers interceded, spoke to Chavannes, and then permitted her to resume protesting inside the metal barriers and standing next to the clinic's main entrance. A. 464-A. 467. The other event occurred on June 20th and involved an interaction between Ms. Verrilli and Ms. Williams.

12

At one point during the second day of the protest, Ms. Verrilli was standing just to the left of the main entrance of the Planned Parenthood. A. 627, A. 656-A. 657. *See also* GX 162. Ms. Williams stood beside her. *Id.* An escort arrived for her shift and attempted to enter the clinic but Ms. Williams "kept leaning on the door." A. 657-A. 660. *See also* GX 191, GX 163. The video exhibits showed that Ms. Verrilli initiated physical contact with Appellant by aggressively pulling open the clinic door onto Ms. Williams's back. *Id. See also* A. 729-A. 732. In reaction, Ms. Williams pushed the door closed, accidentally catching Ms. Verrilli's hand in the door. Ms. Williams leaned into the door for about ten seconds before it was pulled open again. A. 658. *See also* GX 191. At that point, the escort entered the clinic. A. 658-A. 659. *See also* GX 162.

Ms. Verrilli did not call the police or seek immediate medical attention. *See generally* A. 623-A. 750. She was subsequently seen by a doctor for a bruised hand and wrist. A. 662-A. 663. As part of her testimony, the government introduced her medical records. A. 663-A. 665. As described by Ms. Verrilli, the records showed complaints of "pain in dorsal side of right hand," alongside "discoloration, bruising, [and] swelling." A. 665. After the visit, she was directed to take "just ibuprofen or Advil." *Id*.

Ms. Verrilli also testified that Ms. Williams and Ms. Chavannes made a series of incendiary statements, claiming to try to prevent patients from entering

13

the building. A. 669-A. 675. *See also* GX 171, GX 193, GX 170, and GX 173. On cross-examination, however, Ms. Verrilli admitted that although Ms. Williams used phrases like "no one getting into the building" and "by any means necessary," patients and clinic staff were, in fact, able to enter and exit the facility throughout the course of the protests.  A. 683-A. 689. *See also* GX 111, GX 114, and GX 117. Appellant and Chavannes were often positioned on the sidewalk in front of one or both entrances but stepped aside when people sought to enter or exit the building. *Id. See also* A. 706-A. 710, DX E.

For example, Ms. Verrilli was asked to review video from June 19, 2020, admitted into evidence as Exhibit 114. She confirmed that, despite Chavannes's positioning in front of the door, she stepped aside to let someone out of the facility. A. 686. *See also* GX 114. Ms. Verrilli also admitted that a security guard and patient were able to enter the building in Exhibit 117. A. 688-A. 689. In fact, the patient was able to walk right between Ms. Williams and Ms. Chavannes. *Id.* Among other examples, another person was captured entering the facility on video in Exhibit 125. A. 695-A. 696. *See also* GX 125. Even on June 20, 2020, when counter-protesters were present, significantly adding to the congestion, patients were still able to enter. Ms. Verrilli confirmed several examples of this. A. 706-708, A. 719. *See also* DX E, DX W. This was the case at both the main entrance and the administrative entrance.

14

The government presented no evidence at trial that on June 20, 2020, either Ms. Verrilli or anyone from the Planned Parenthood called 911 or complained to any police officers at the protest that Ms. Williams had harmed or assaulted Ms. Verrilli. *See generally* A. 403-A. 422, A. 486-A. 542, and A. 623-A. 750. Nor was there any evidence presented that Ms. Verrilli or any other person from Planned Parenthood made a complaint to law enforcement in the weeks or months afterward. *Id.*

Ms. Williams's and Ms. Chavannes's statements made during the course of their Manhattan protests were loud. They were excited. They were spoken in angry tones. Appellant's statements were particularly provoking; she used phrases like "we are violently pursuing" (A. 451, GX 188), "you hit these clinics and you hit them with everything you've got" (A. 495, GX 101), "we are going to destroy the works of the enemy" (A. 495, GX 101), "we're going to terrorize this place" (A. 495-A. 496, GX 102), and "by any means necessary" (A. 669-A. 670, GX 171).

Neither Ms. Williams nor Ms. Chavannes ever displayed any weapons, attempted to storm the doors or enter the clinic in any way, attempted to damage any part of the clinic property, or ever chained entrances shut or laid down in front of any entrances. *See e.g.*, A. 465, A. 688, A. 691, A. 696, A. 707-708, A. 710, and A. 720. Like the counter-protestors, Appellant and Chavannes were sometimes positioned in front of the clinic entrance(s). A. 688, A. 710. The evidence at trial

15

conclusively showed dozens of instances, however, where Ms. Williams stepped out of the way to allow patients or employees to enter or exit the clinic. A. 683-A. 689, A. 706-A. 710. *See also* GX 111, GX 114, GX 117, and DX E.

II.     *Other Protests*

After the June 2020 Manhattan protests, Ms. Williams and Ms. Chavannes traveled to other states to engage in similar protests. To try to prove the conspiracy charge, the government called witnesses to testify about additional protests – Fort Myers, Florida: January 27th, 2022; Atlanta, Georgia: July 7th, 2022; and Nashville, Tennessee: July 28th, 2022.  Because Ms. Williams was acquitted of the conspiracy count, however, these additional protests need not be discussed or considered here.

III.     *Verdict*

At the conclusion of its deliberations, the jury acquitted Ms. Williams of Count 1, the conspiracy charge, but convicted her of Count 2. A. 1180.  It acquitted Chavannes of all Counts. *Id.* Following the verdict, Ms. Williams's trial counsel filed a Rule 29 motion. Dkt. 131. It was denied by the District Court and Appellant proceeded to sentencing. Dkt. 135.

C. <u>Sentencing</u>

Before sentencing, Ms. Williams submitted a memorandum urging the Court to impose a sentence of probation or home confinement. A. 1182-A. 1222. This

request was made on the grounds that, among other things, Ms. Williams grew up in an unstable household in the presence of abuse and currently has significant family responsibilities as a new mother to her two-year-old daughter. *Id*. At sentencing, Appellant's trial counsel once again asserted "incarceration would be far greater than what is contemplated or necessary under these circumstances." A. 1286.

The District Court denied Ms. Williams's request for a non-incarceratory sentence. A. 1305. The Court calculated Ms. Williams's Federal Sentencing Guideline level to be 19, and her criminal history category to be III, with a resulting sentencing range of 37-46 months' imprisonment. The Court decided to impose a sentence of 41 months plus a term of supervised release. A. 1305-A. 1306. *See also* A. 1313-A. 1314. The Court justified this sentence by stating that Ms. Williams had engaged in "serious misconduct." A. 1299. The Court also alluded to Ms. Williams's incendiary statements at the Manhattan Planned Parenthood: "She threatened to terrorize this place. She threatened war. She said that she was going to use any means necessary, and she did." A. 1299. The Court particularly considered Ms. Verrilli's injury as an aggravating factor. A. 1300.

The Court claimed to consider similarly situated defendants, reasoning that "FACE Act violations have resulted, although not numerous violations, but some have resulted in significant incarceratory sentences." A. 1302. It specifically cited

17

to the *Handy* case "in which organizers of the disruption at the Surgi-clinic, like Williams, received 57 and 34 months." *Id.*   With all this in mind, the District Court "considered the probationary and home confinement sentence that was requested" by Appellant's trial counsel and determined "it is simply not appropriate here." A. 1305.

Ms. Williams filed a timely notice of appeal on July 24, 2024. A. 1319.  On October 16, 2024, Ms. Williams surrendered to a Bureau of Prisons facility as directed.  She is currently serving her sentence.

18

## SUMMARY OF ARGUMENT

Bevelyn Williams raises three claims on appeal. <u>First</u>, she argues that the District Court erred when it denied Appellant's request to instruct the jury on the parameters of the First Amendment. In June 2020, Bevelyn Williams protested outside of a Planned Parenthood in Manhattan. She was loudly and vociferously making her political and religious views known. The FACE Act, 18 U.S.C. § 248(a)(1), which she was charged with violating, can be violated both by conduct and by constitutionally unprotected speech – namely "true threats" resulting in intimidation.

In light of the fine line between constitutionally acceptable speech and expressive conduct on the one hand, and criminal speech or conduct on the other, a line the FACE Act itself acknowledges, *see* 18 U.S.C. § 248(d)(1), Ms. Williams made a request before her trial for the District Court to instruct the jury on the First Amendment and its boundaries. Ms. Williams also sought to argue to the jury that her speech during the protest as well as some of her actions were protected by the First Amendment and could therefore not be considered by the jury as facts undergirding a conviction.

The District Court denied both of these requests. This, the first claim on appeal argues, was error. Ms. Williams's jury instruction request was legally correct and would have been crucial in aiding the jury to navigate the complex

19

thicket between protected and unprotected speech. Even though the jury necessarily had to find that Ms. Williams's "conduct" caused injury, given the elements of the charge she still could be convicted on her speech alone. Had the jury been appropriately charged, and had Ms. Williams been permitted to discuss First Amendment protections during her arguments to the jury, the result may very well have been different.

The second claim on appeal reprises Ms. Williams' pretrial arguments alleging that § 248(a)(1) of the FACE Act was unconstitutional. She raised two substantive constitutional claims that were denied by the trial court: (a) that Congress lacked the legal authority to implement the FACE Act under the Commerce Clause and Section 5 of the 14th Amendment; and (b) that the FACE Act is not a content-neutral regulation of expressive conduct, and should be subject to strict scrutiny analysis now that access to abortion is not recognized as a fundamental right.

In ruling against Appellant on these claims, the trial court was bound to follow existing Second Circuit precedent – namely, this Court's decision in *United States v. Weslin*, 156 F.3d 292 (2d Cir. 1998), in which it rejected substantially similar challenges to the FACE Act. In the years since *Weslin*, however, the reach of the Commerce Clause has been scaled back, and the legal understanding of what constitutes content-based speech regulation has changed considerably. And the

20

Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization,* 597 U.S. 215 (2022) removed access to abortion services from those fundamental rights for which the federal government has the authority to regulate private conduct pursuant to Section Five of the 14th Amendment. Ms. Williams therefore asks this Court to reconsider its holdings in *Weslin* in light of the changed legal landscape since 1998 regarding the reach of the Commerce Clause, more recent Supreme Court jurisprudence regarding regulation of content-based speech and expressive conduct, and, significantly, the impact of the *Dobbs* decision.

The third claim on appeal argues that the 41-month custodial sentence imposed on Ms. Williams was substantively unreasonable. Although the sentence fell within a correctly calculated guideline range, that range significantly overstated the seriousness of her conduct and the sentence represented an outlier in FACE Act sentences.

21

## **ARGUMENT**

**POINT I:**     **The Trial Court Erred When It Denied Appellant's Request for a First Amendment Jury Instruction and Denied Appellant's Request to Make First Amendment Based Arguments to the Jury**

Bevelyn Williams was convicted of violating 18 U.S.C. § 248(a)(1), the statute known as the Freedom of Access to Clinic Entrances ("FACE") Act. Sec. 248(d) specifically instructs that "[n]othing in this section shall be construed to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution." In accordance with this section, before trial Appellant requested a jury instruction to define the parameters of the First Amendment in the context of this case for the jury. A. 136-A. 137.[1]

The defense also asked to argue to the jury in summation that Ms. Williams's speech and expressive conduct were protected by the First Amendment. A. 221-A. 225. The defense contended that just as "juries are not assumed to know and be familiar with all of the permutations of the burden of proof in criminal cases, the presumption of innocence, the right to remain silent, or any of the other constitutional rights that judges explain to juries in charging instructions . . . jurors

---

[1] The defense's proposed jury instruction (A. 136-A. 137) was further refined and honed in its opposition to the government's motions *in limine* (A. 207), and during the final pretrial conference (A. 226-A. 318).

22

cannot be presumed to know the range of expression permitted by the First Amendment." A. 224. It further argued that "[i]n the absence of a jury instruction on the First Amendment or the defense referencing the First Amendment, there is a danger that a juror could conclude that there is no lawful reason for a person to angrily shout violent-sounding words at other people and to stand close to those other people when doing it." A. 222. Counsel for Ms. Williams observed, "we can't assume that they understand what the First Amendment means or says. So an instruction I think would be helpful to the jury so that we could avoid the confusion from different jurors, if it happens, expressing contrary views or views that actually confuse the ultimate issue here, as opposed to clarifying it." A. 293.

The District Court rejected the defense request for a First Amendment jury instruction. It also denied its request to make arguments to the jury that Ms. Williams's speech and expressive conduct were protected by the First Amendment. The District Court's decision was error.

### A. Standard of Review

Charging errors are reviewed *de novo* if the defendant raised an objection to the District Court's failure to provide a requested instruction, as Ms. Williams did here. A harmless-error standard applies. *See United States v. Zhong*, 26 F.4th 536, 549-50 (2d Cir. 2022). On harmless-error review, relief from conviction will occur

23

if the defendant can show that "(1) the requested instruction was legally correct; (2) it represents a theory of defense with basis in the record that would lead to acquittal; and (3) the theory is not effectively presented elsewhere in the charge." *United States v. Avenatti*, 81 F.4th 171, 200 (2d Cir. 2023) (internal citations and quotations marks omitted).

### B. Applicable Law

It is well settled that "[a]s a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988). *See also United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997) ("Upon a proper request, a defendant is entitled to a jury instruction on any defense theory for which there is a foundation in the evidence.").

This general rule also applies when a defendant requests a First Amendment instruction. *See e.g. United States v. Fleschner*, 98 F.3d 155, 158 (4th Cir. 1996) ("Having made a timely request, the defendants would have been entitled to an instruction on a First Amendment defense if there were evidence sufficient for a reasonable jury to find in their favor on that account."). In a frequently cited case in this area, *United States v. Freeman*, 761 F.2d 549, 551 (9th Cir. 1985), the 9th Circuit ruled: "Where there is some evidence, however, that the purpose of the

24

speaker or the tendency of his words are directed to ideas or consequences remote from the commission of the criminal act, a defense based on the First Amendment is a legitimate matter for the jury's consideration."

C. Discussion

The District Court's primary rationale for its refusal to give a First Amendment instruction was its pretrial ruling that the FACE Act was constitutional on its face. A. 94-A. 117. The Court therefore reasoned that First Amendment arguments played no role in the case. According to the Court, if the jury found that Ms. Williams "intended to injure, intimidate, or interfere with patients or employees of a reproductive health center" – the elements of the FACE Act – then, by definition, Ms. Williams did not engage in protected speech or conduct. A. 294.

In so doing, the Court appeared to conjure a rule that the First Amendment is *per se* irrelevant, prejudicial, and inadmissible in a case that factually involves political and religious protest and expression, simply because the law under which Ms. Williams was prosecuted is not itself contravened by the First Amendment. That is not the law. Ms. Williams's request for a First Amendment instruction was not a renewed attack on the FACE Act's constitutionality. It did not seek to challenge the District Court's ruling that elements of the FACE Act, such as

25

"threat of force" or "intimidation" were, *on their face*, unprotected by the First Amendment. Instead, Appellant urged the District Court to provide guidance to the jury how it should analyze "threats of force" and "intimidation" in the specific factual context of this case. Did Ms. Williams's threatening language amount to "true threats," or was it constitutionally protected? Was her conduct expressive and therefore permissible, or was it criminal?

The District Court's analysis failed to account for the complexity of a statute which can be violated by both speech and conduct – or in which the motive for a defendant's speech may not have been the same as the motive for her conduct. As charged to the jury, the elements of Appellant's count of conviction, 18 U.S.C. § 248(a)(1), were as follows:

> First, that Williams used force, threat of force, or physical obstruction as alleged in the indictment.
>
> Second, that Williams intentionally injured, intimidated, or interfered with patients or employees of the Manhattan Planned Parenthood, or attempted to do so.
>
> And, third, that Williams acted as she did because the employees of the Manhattan Planned Parenthood were and had been providing reproductive health services or the patients were and had been obtaining reproductive health services.
>
> Fourth, that Williams' conduct resulted in bodily injury.

A. 1142. The first element can be established by proof of either conduct (force or physical obstruction) or speech (threat of force). Because the jury could find that

26

speech met this element, an instruction defining protected speech versus unprotected "true threat" language was essential.

The evidence established that Ms. Williams employed all kinds of provocative language during her protest outside the Manhattan Planned Parenthood. She used phrases like "we are violently pursuing" (A. 451, GX 188), "you hit these clinics and you hit them with everything you've got" (A. 495, GX 101), "we are going to destroy the works of the enemy" (A. 495, GX 101), "we're going to terrorize this place" (A. 495-A. 496, GX 102), and "by any means necessary" (A. 669-A. 670, GX 171).

However, threatening or incendiary language is nevertheless protected by the First Amendment if it is not a "true threat." *See United States v. Alvarez*, 567 U.S. 709, 717 (2012) ("content-based restrictions on speech have been permitted, as a general matter, only when confined to the few historic and traditional categories of expression long familiar to the bar. Among these categories are . . . true threats. . .") (internal citations and quotation marks omitted). This Court has repeatedly held, including in the context of the FACE Act, that "[w]hen determining whether a statement qualifies as a threat for First Amendment purposes, a district court must ask whether the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and

27

imminent prospect of execution…." *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 196-97 (2d Cir. 2001) (finding that a statement to a doctor leading the doctor to fear for her safety nevertheless "did not indicate the 'unequivocal immediacy and express intention' of a true threat" for purposes of a FACE Act civil injunction) (citing *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976)).  Moreover, whether speech constitutes "true threats" is a question for the jury.  *See United States v. Hunt*, 82 F.4th 129, 137 (2d Cir. 2023) ("while 'true threats' are not protected by the First Amendment, whether words used are a true threat is a question of fact for the jury.") (internal citations and quotation marks omitted).

Ms. Williams's jury was instructed that "'threat of force' means precisely what the name implies; *namely, threat by either words or gestures to inflict some harm*. Nonverbal conduct may communicate a threat. While force requires some physical manifestation of violence, a threat of force falls short of actual violence and ordinarily signifies a serious statement or act evidencing an intention to use force at once *or in the future*, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner…." A. 1143 (emphasis added). This is not a proper "true threat" analysis under the First Amendment, and it lacked the "unequivocal, unconditional, immediate, and specific" language that this Court has required in making the determination as to whether a threat of force is

28

protected by the First Amendment or, instead, can be prohibited under the FACE Act. *See Spitzer*, 273 F.3d at 196.

Without a First Amendment explanation, the jury may well have concluded that the first element of the count was met simply through Ms. Williams's aggressive yet general language. With the benefit of a proper First Amendment instruction, however, the jury would likely have decided that even advocacy for the use of force or violence (*i.e.* "terrorize this place," "war," "by any means necessary") made in general terms, was protected. *See e.g., United States v. Hunt*, 573 F.Supp.3d 779, 814 (E.D.N.Y. 2021) (jury was properly instructed that "the First Amendment protects . . . even advocacy of the use of force or violence").

The second element of § 248(a)(1) requires a similar analysis. To be met, the jury could find that Ms. Williams "intimidated" or "attempted to intimidate" patients or employees of the Manhattan Planned Parenthood (as opposed to interfered with or injured). *See* 18 U.S.C. § 248(a)(1). Intimidation can be accomplished through physical action and it can be accomplished through words. But not all speech that has the effect of intimidating someone is unlawful. "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." *Virginia v. Black*, 538 U.S. 343, 360 (2003). *See also United States v. Heineman*, 767 F.3d 970, 981 (10th

29

Cir. 2014) ("This sentence means that intimidation cannot be proscribed unless the speaker utters the threatening words with the intent of placing the victim in fear of bodily harm or death.") (internal quotation marks omitted).

In other words, language can have an intimidating effect but not be of such a specific threatening nature as to amount to an exception to protected speech. *See United States v. Sryniawski*, 48 F.4th 583, 587 (8th Cir. 2022) ("Even where emotional distress is reasonably expected to result, the First Amendment prohibits Congress from punishing political speech intended to harass or intimidate in the broad senses of those words."); *United States v. Yung*, 37 F.4th 70, 80 (3d Cir. 2022) (To "intimidate," we hold, a defendant must put the victim in fear of death or bodily injury . . . . That reading limits . . . ."intent to intimidate" to what it "especially" means, a form of true threats or speech integral to a crime.") (internal citation and quotation marks omitted).

Ms. Williams's jury was instructed only that "[t]he term 'intimidate' means to place a person in reasonable apprehension of bodily harm to himself or herself or to another." A. 1144. A more thorough instruction rooted in the First Amendment would have assisted the jury in parsing Ms. Williams's language to determine whether it veered from protected speech into "true threats" with the "intent of placing the *victim* in fear of bodily harm or death," (emphasis added) and therefore met the "intimidation requirement." *Black*, 538 U.S. at 360. Without

30

such an instruction, the jury had no clear sense of what the Constitution prohibits and what it protects.

The fourth element of Count 2 – that Appellant's "conduct resulted in bodily injury" – did not relieve the District Court of its obligation to provide a First Amendment instruction. The jury was not instructed that the "conduct" to which the fourth element referred needed to be the same conduct found in the first or second element or even that it needed to be intentional conduct motivated by the reproductive health factor. In other words, it was possible for the jury to convict Ms. Williams even if it concluded that the first two elements were established by speech, not conduct, and also found that she *separately* engaged in conduct that resulted in injury irrespective of motive.

For example, the jury could have believed that Appellant caused injury when she pushed the door onto Ms. Verrilli's hand, but not with the intent to injure or intimidate Ms. Verrilli *because* she was a reproductive health worker, but rather in retaliation for having the door pulled violently against her back. Separately, the jury could have found that Ms. Williams made general threats of violence toward Planned Parenthood employees and patients because they were associated with a reproductive health facility – even though such threats may have been protected by the First Amendment. Thus, the jury could have found Ms. Williams guilty because the "threats" and "intimidation" of the first two elements were met (albeit

31

by constitutionally protected speech), and the fourth element was established by her separate "conduct" that independently caused physical injury to Ms. Verrilli. Such a result would be contrary to law and could have been avoided with a proper First Amendment instruction.

The FACE Act is not like most other federal criminal statutes. It directly implicates First Amendment rights, as the statute itself acknowledges. *See* 18 U.S.C. 248(d)(1) ("[n]othing in this section shall be construed to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution."). In a case involving a statute that expressly incorporates the First Amendment and one in which both conduct *and* speech can comprise a violation, the jury is entitled to be made aware of the boundaries of what the First Amendment protects.

Moreover, even where there is force and injury, as was alleged in this case, the legislative history of the FACE Act emphasizes that such force or injury must necessarily be intentional *and* motivated by the fact that the victim is or has been engaged in obtaining or providing reproductive health services. *See e.g.* H.R. Rep. 103-306, October 22, 1993, 1993 WL 465093 at *708 ("Subsection 248(a)(1) would cover acts of force, threats of force, and physical obstruction that intentionally injure, intimidate or interfere with any person, *but only if these actions are undertaken because the victim or others are obtaining or providing*

32

*reproductive health services"* (emphasis added). Ms. Williams's jury, however, was not instructed that the injury to Ms. Verrilli must necessarily have been intentionally caused because she was an employee or customer of the clinic and the jury may well therefore have convicted Ms. Williams simply because an injury occurred for which she was the proximate cause, irrespective of motive, as long as it found that the first two elements satisfied the required intent.

A First Amendment instruction in this context is not a novel proposition. For example, courts routinely provide such an instruction in prosecutions involving the material support of terrorism statute, which contains a similar First Amendment provision. *See* 18 U.S.C. § 2339B(i) ("Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States."). Thus, in *United States v. El-Mezain*, 664 F.3d 467, 536 (5th Cir. 2011) the 5th Circuit approved the District Court's reading of § 2339B(i) to the jury, the text of the First Amendment itself, as well as an instruction on how to evaluate the First Amendment in the context of actions constituting material support. *See also United States v. Hassan*, 742 F.3d 104, 128 (4th Cir. 2014) (approving of the District Court's First Amendment

33

instruction in 18 U.S.C. § 2339A material support case, while rejecting defendants' specific proposed First Amendment language).[2]

Whether Ms. Williams's protest language and conduct veered into criminality was precisely the question the jury was tasked to answer in this case. By depriving the jury of an explanation and definition of the parameters of constitutionally protected speech, the Court forced the jury to answer this question with one hand tied behind its back. This failure to properly instruct the jury deprived Appellant of a fair trial.

**POINT II:** **Section (a)(1) of the FACE Act Is Unconstitutional In Light Of Recent Intervening Supreme Court Precedent**

In pretrial proceedings, Ms. Williams argued that the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) ("*Dobbs*") changed the legal landscape supporting the FACE Act, since there was no longer a compelling – or even a substantial – federal government interest in protecting access to abortion. A. 47-A. 60. As such, Appellant sought to dismiss the indictment on the grounds that the FACE Act could no longer survive constitutional scrutiny. *Id.*

---

[2] As discussed above, First Amendment instructions have also been given in "threat" cases (*see Hunt*, 573 F.Supp.3d at 814), and other contexts. *See e.g. Fleschner*, 98 F.3d at 158, *Freeman*, 761 F.2d at 551 (tax laws).

The District Court rejected all the defendants' constitutional arguments, citing existing Second Circuit precedent. *United States v. Williams*, 701 F.Supp.3d 257 (S.D.N.Y. 2023) ("*Williams I*"); A. 94-A. 117. The District Court relied heavily on this Court's decision in *United States v. Weslin*, 156 F.3d 292 (2d Cir. 1998), which held the FACE Act to be a constitutional exercise of legislative authority under the Commerce Clause, as well as a content-neutral regulation of conduct that met the three-part *O'Brien* test. *Weslin* at 297, *citing United States v. O'Brien*, 391 U.S. 367 (1968).

While Ms. Williams does not dispute that this Court's precedential authority bound the District Court, Appellant respectfully submits that these holdings of *Weslin* are no longer good law. *Weslin* was not only decided before *Dobbs*, (2022) but also before *Reed v. Town of Gilbert,* 576 U.S. 155 (2015), *McCullen v. Coakley*, 573 U.S. 464 (2014), and *United States v. Morrison*, 529 U.S. 598 (2000). This Court has not squarely addressed either issue since the Supreme Court modified the law of content-neutrality as well as the scope of the Commerce Clause. Appellant asks that this Court do so now and find that the FACE Act is no longer a proper exercise of Congress' congressional authority; or, if it does so find, that it nevertheless no longer meets the *O'Brien* test after *Dobbs*.

35

A. <u>Standard of Review</u>

Appellant is asking this panel to revisit the decision of a prior Second Circuit panel. Ordinarily, a panel of the Second Circuit is "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." *United States v. Wilkerson,* 361 F.3d 717, 732 (2d Cir.2004). However, "if there has been an intervening Supreme Court decision that casts doubt on our controlling precedent, one panel of this Court may overrule a prior decision of another panel. The intervening decision need not address the precise issue decided by the panel for this exception to apply." *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010) (internal citations and quotation marks omitted). In light of the intervening decisions by the Supreme Court discussed herein, this Court has the power to revisit and overrule *United States v. Weslin.*

B. <u>After *Dobbs*, the FACE Act Can No Longer be Sustained as a Lawful Exercise of Federal Government Authority Under Section 5 of the 14th Amendment</u>

The FACE Act's legitimacy as a federal regulation was predicated on two independent bases of authority: (1) Congress's authority to regulate interstate commerce under Article I, Section 9, Clause 3 of the Constitution; and (2) Section 5 of the 14th Amendment. *See* H.R. Conf. Rep. 103-488, May 2, 1994, 1994 WL

36

168882 at *1. With respect to the latter, the Senate Report accompanying the

FACE Act as introduced noted specifically that:

> The Freedom of Access to Clinic Entrances Act seeks to protect the right to terminate a pregnancy, a right that falls squarely within the rights guaranteed by the Fourteenth Amendment. Recently, in *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 112 S.Ct. 2791 (1992), the Supreme Court reaffirmed its longstanding holding that a woman's decision to terminate her pregnancy prior to fetal vitality is protected from state interference by the Fourteenth Amendment's liberty clause. [ ] Although the Fourteenth Amendment restricts only state action by its terms, the Committee concludes that Congress has the authority under the Fourteenth Amendment to reach the private conduct prohibited by [the FACE Act][…] Thus, Congress has the authority under Section 5 of the Fourteenth Amendment to read purely private conduct on the ground that states and municipalities, acting alone, will be unable to provide sufficient protection against private acts that threaten the full enjoyment of Federal constitutional rights such as the right to terminate a pregnancy, reaffirmed in *Casey*.

S. Rep. 103-117, 1993 WL 286699, July 29, 1993 at *32-33.

The Supreme Court's decision in *Dobbs* however, specifically overturned

*Casey* and held that there was not, in fact, a Federal constitutional right to

terminate a pregnancy. 597 U.S. 215 (2022) Absent this federal right that the 14th

Amendment previously guaranteed, there is simply no longer a 14th Amendment

liberty interest at play here. Section Five cannot be utilized to proscribe private

conduct in order to protect a non-existent federal Constitutional liberty interest.

Thus, after *Dobbs* the FACE Act can no longer be sustained purely on this basis.

C. § 248(a)(1) of the FACE Act[3] Cannot be Sustained as a Lawful Exercise of Federal Government Authority Under the Commerce Clause Pursuant to *United States v. Morrison*

This Court held over a quarter century ago that "FACE is a valid exercise of Congress' power under the Commerce Clause," specifically as activity "having a 'substantial relation' to, or which 'substantially affect[s],' interstate commerce." *Weslin*, 156 F.3d at 296 (citing *United States v. Lopez*, 514 U.S. 549 at 558-59 (1995)). In making this ruling, which remains the law of this Circuit, the court relied heavily on the perceived contrast between the legislative history of the Gun Free Schools Act (the Act in question in *Lopez*), and that of the FACE Act. In *Lopez*, "the Supreme Court noted the absence of specific congressional findings that the Gun Free School Zones Act regulated activities substantially affecting interstate commerce....In contrast, Congress specifically found that the activities governed by FACE affect interstate commerce." *Weslin*, 156 F.3d at 296. The legislative history *Weslin* cites included findings that "women travel interstate to obtain reproductive health services," "doctors travel from state to state and often

---

[3] Because Appellant was not convicted under Section 248(a)(2), which is identical in most respects to § 248(a)(1) except that it prohibits injuring, intimidating, or interfering with "any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship," she does not challenge the constitutionality of that portion of the Act – although it arguably bears even a weaker relationship to interstate commerce than Section 248(a)(1). *See e.g., Jingrong v. Chinese Anti-Cult World Alliance Inc.*, 16 F.4th 47, 63 (2d Cir. 2021) (noting that the Supreme Court's decisions in *U.S. v. Lopez* and *U.S. v. Morrison* "expressly rejected the notion that the commerce power reaches 'noneconomic, violent criminal conduct' of the sort proscribed here 'based solely on that conduct's aggregate effect on interstate commerce.'") (Walker, J. concurring) (internal citations omitted).

38

cover great distances to perform abortions," and "clinics purchase medical and other supplies in interstate commerce." *Id.*

Just two years after *Weslin,* however, the Supreme Court decided *United States v. Morrison*, 529 U.S. 598 (2000). In *Morrison* – a case about the regulation of gender-based violence, and in which Congress *had* made specific and "numerous findings regarding the serious impact that gender-motivated violence has on its victims and their families" – the Court rejected the idea that legislative findings of a substantial relationship to interstate commerce, while important, would suffice to sustain a federal regulation. *Morrison* at 614 ("As we stated in *Lopez*, "[s]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.") (internal citations omitted). The *Morrison* Court took pains to explain that its decision in *Lopez* relied not on such legislative history, but principally on the fact that the *activity being regulated* was *not* economic activity, but rather criminal activity of individuals – and thus properly fell to the states, not the federal government, to regulate. *Id.* at 610 ("[A] fair reading of *Lopez* shows that the noneconomic, criminal nature of the conduct at issue was central to our decision in that case").

Reviewing its history of Commerce Clause case law, the *Morrison* majority continued: "[T]he pattern of analysis is clear. 'Where economic activity

39

substantially affects interstate commerce, legislation regulating that activity will be sustained.' …. *Lopez's* review of Commerce Clause case law demonstrates that in those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, *the activity in question has been some sort of economic endeavor.*" *Morrison* at 610-612 (emphasis added). The Court proceeded to flatly "reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617.

The FACE Act, meanwhile, is directed at noneconomic, sometimes violent conduct (and speech) between and among persons frequently located *outside* of private health clinics or churches. It proscribes acts that are intended to "injure, intimidate, or interfere with *any person* because that person is *or has been*, or in order to intimidate such person or any other person or class of persons from, obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1) (emphasis added). This is attenuated in its relationship to commerce; the target of the proscribed actions is not an "instrumentality, channel[], or good" of interstate commerce, *Morrison* at 618, but individual persons in any location who may have, or even may have only had in the past, some relationship to women's reproductive health services. This is not regulation of economic activity; it is not even regulation of reproductive health facilities. Rather, it is regulation of the sort of

40

"noneconomic" or "violent" conduct between individual persons with a subject-matter motivation that the Supreme Court ruled in *Morrison* could not extend to federal prohibitions against gender-based violence, and that in *Lopez* could not extend to federal regulations about where a person may carry a gun. *Weslin* should be overturned, and §248(a)(1) of the FACE Act ruled unconstitutional.

    D. <u>Even if Congress has the Authority under the Commerce Clause to Enact the FACE Act, it is a Content-Based Regulation of Speech that No Longer Survives Scrutiny After *Dobbs*</u>

This Court's decision in *Weslin* 26 years ago also found that "FACE is not a viewpoint- or content-based regulation." *Weslin,* 156 F.3d at 296.  In *Weslin*, the defendants had asked the court to invalidate the FACE Act in part based on the analysis of content-based speech regulation in *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), in which the Court struck down a local hate-crimes ordinance on the grounds that it constituted impermissible content-based regulation of speech. *Id.* The *Weslin* court dismissed the analogy out of hand, reasoning that "[t]he law in *R.A.V.* dealt with pure speech and discriminated on the basis of viewpoint as well. FACE, which in any case is viewpoint-neutral, does not govern speech as such but, instead, is concerned with conduct that frequently has expressive components." *Weslin* at 297.  In *R.A.V.*, however, the statute at issue did *not* deal with "pure speech," as the *Weslin* court suggested; rather, it was an ordinance that specifically

41

targeted expressive conduct – specifically, cross burning and the placing of swastikas – that "arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." *R.A.V.*, 505 U.S. at 380. The Minnesota Supreme Court, meanwhile, had already constructed the phrase "arouses anger, alarm or resentment" as a limiting phrase that meant the ordinance only reached "conduct that itself inflicts injury or tends to incite immediate violence" – in other words, as with the FACE Act, it prohibited "only expression 'that the first amendment does not protect[]'" – and which had a content-based motivation. *R.A.V.* at 380-381 (internal citations omitted). The Supreme Court rejected the argument that such conduct lies outside the confines of First Amendment analysis and held that the ordinance unconstitutionally prohibited speech based on the subject matter motivations of those engaged in the expressive conduct.

*Weslin* nevertheless rejected any comparison between the FACE Act and *R.A.V.*, and instead analyzed the Act (affirmatively) based on the criteria of *United States v. O'Brien*, 391 U.S. 367 (1968) for considering the validity of content- or viewpoint-neutral laws "that burden expression while restricting proscribable conduct…: (i) the regulation must serve an important or substantial government interest; (ii) the interest must be unrelated to the suppression of expression; (iii) the incidental restriction of First Amendment freedoms must be narrowly tailored to that interest." *Weslin* at 297.

In 2014, however, the Supreme Court decided *McCullen v. Coakley*, 573 U.S. 464 (2014). In *McCullen*, the Court instructed that even when a statute is deemed content-neutral and is not subject to strict scrutiny – in that case, a state statute regulating access to "buffer zones" around abortion clinics (which, notably, did not contain the requisite intent language of the FACE Act) – it nevertheless must be "narrowly tailored to serve a significant government interest" so as not to "burden substantially more speech than is necessary." *McCullen*, 573 U.S. at 486 (2014) (citing *Ward v. Rock Against Racism*, 491 U.S. 781 at 796, 799 (1989)). The following year, the Court issued another content-based speech decision in *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155 (2015). *Reed* clarified that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," or, even if facially content-neutral, "cannot be 'justified without reference to the content of the regulated speech.'" *Reed*, 576 U.S. at 163-4.

In this context – pursuant to clarification of the law arising after *Weslin* – the FACE Act cannot be considered "content-neutral," because it does not prohibit all interference with patients or providers of reproductive health services, but only those whose interference is motivated by the fact that those patients or providers are "obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1). This is not a question of whether a protestor is pro-choice or anti-abortion, but

43

rather a question of the government's need to look into the content of the speech or expressive conduct itself in order to determine its motivation and the intent of the speaker or activist.

The legislative history of the FACE Act further supports this assertion and undermines the *Weslin* holding that "FACE prohibits obstruction of reproductive health clinics regardless of the issue that animates the demonstrators." *Weslin*, 156 F.3d at 297. The Senate committee report explained that "for example, if an environmental group blocked passage to a hospital where abortions happen to be performed, but did so as part of a demonstration over harmful emissions produced by the facility, the demonstrators would not violate this Act….In that example, the demonstrators' motive is related to the facility's emissions policy and practices and not to its policy and practices on abortion-related services. The Committee has concluded that inclusion of the motive elements is important to ensure that the Act is precisely targeted at the conduct that, as the Committee's record demonstrates, requires new Federal legislation: deliberate efforts to interfere with the delivery of abortion-related services." S. Rep. No. 103-117, 103rd Cong., 1st Sess. 24 (1993), 1993 WL 286699 at *24. This places the FACE Act squarely within the ambit of content-based regulation of speech and should subject it to strict scrutiny analysis.

Even if the FACE Act were still considered facially neutral, however, *Dobbs* ensures that the regulation of expressive conduct outside a private health

44

care facility can no longer withstand even intermediate scrutiny, as the prohibitions under the FACE Act no longer serve an important or substantial government interest, nor are they narrowly tailored to the degree required by *McCullen* ("the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests"). 573 U.S. at 495.

The Second Circuit has not addressed these content-neutrality questions after *Dobbs*, and has only done so once after *Reed*, in *New York ex rel. Underwood v. Griepp*, 991 F.3d 81 (2d Cir. 2021), *vacated on other grounds* 11 F.4th 174 (2d Cir. 2021). In that case, a civil injunctive proceeding involving the FACE Act, this Circuit initially reaffirmed its holding in *Weslin*, stating that the FACE Act was "facially neutral and constitutional," *Griepp* at 128; and then later vacated that opinion in its entirety on the grounds that the state had not met a showing of irreparable harm. *New York by James v. Griepp* ("*Griepp II*"), 11 F.4th 174 (2d. Cir. 2021). In denying Ms. Williams's motion to dismiss, the District Court interpreted the vacated *Griepp* opinion to mean that "Defendant's argument that *McCullen* and *Reed* overrule *Weslin* has already been rejected in this Circuit," adding "[t]hat the Second Circuit later vacated its opinion on other grounds does not diminish its reasoning or that of the District Court." A. 113-A. 114. In vacating its original opinion, however, this Court emphasized that it very specifically *declined* to "reach [the protesters']…constitutional challenges to FACE" after

45

*Weslin*, thus leaving the issue ripe for consideration. *Griepp II*, 11 F.4th at 176. Appellant urges the Court to reach these challenges now and find § 248(a)(1) of the FACE Act unconstitutional.  If so, Ms. Williams's conviction should be vacated, and the indictment dismissed.

**POINT III:   Appellant's 41-Month Custodial Sentence Was Substantively Unreasonable**

This Court will vacate a sentence as substantively unreasonable where it is "so shockingly high, shockingly low, or otherwise unsupportable as a matter of law that allowing [it] to stand would damage the administration of justice." *United States v. Singh*, 877 F.3d 107, 115 (2d Cir. 2017) (internal quotation marks omitted). While such review is "particularly deferential" to the District Court, *United States v. Broxmeyer*, 699 F.3d 265, 289 (2d Cir. 2012), this Court "has not shied away" from finding a sentence substantively unreasonable "when appropriate." *Singh*, 877 F.3d at 115 (internal citations omitted).  A "sentence within the properly calculated Guidelines range can be substantively unreasonable." *United States v. Pugh*, 945 F.3d 9, 27 (2d Cir. 2019) (citing *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010)).

Here, at a minimum, "on this record, even if [Ms. Williams's] sentence does not shock the conscience, it at the very least stirs the conscience." *Singh*, 877 F.3d at 116 (internal citation and quotation marks omitted).  The District Court imposed

46

a sentence of 41 months in custody on a 33-year-old mother of a two-year-old, with a minimal criminal record and a multi-year record of compliance with Pretrial Services and the directives of the Court. The alleged criminal conduct that warranted such a high sentence, according to the District Court, was Ms. Williams's protest activities, including language that the Court considered aggravating, as well as her pushing the door to the Planned Parenthood closed on an employee's hand, causing bruising. Yet, the sentence was the second highest custodial term imposed for a violation of the FACE Act in recent memory. That fact, alone, suggests that the Court's sentence fell outside the "boundaries of reasonableness" under the circumstances. *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008).

In explaining its grounds for imposing the 41-month sentence, the District Court stated that it was considering other sentences in FACE Act cases to avoid undue sentencing disparities. Specifically, it pointed to the *Handy* case in Washington D.C., where the leaders of that protest at a Washington reproductive health clinic received sentences of 54 months and 34 months, respectively. A. 1302. *See United States v. Handy*, No. 22-CR-096 at Dkt. Nos. 605, 611 (D.C. District Ct. 2024). The 54-month sentence in *Handy* was the highest term of imprisonment imposed for a violation of the FACE Act in years. Higher sentences in the past generally involved extreme acts of violence outside of reproductive

47

health centers, including shootings, murder, *see e.g. United States v. Hill*, 893 F.

Supp. 1034 (N.D. Fl. 1994), or shipments of Anthrax, *see United States v.*

*Waagner*, 2014 WL 2710953 (E.D. Pa. 2014).

The District Court's comparison of Ms. Williams to the top defendants in

*Handy*, however, was misplaced. First, the leadership roles of Lauren Handy and

Jonathan Darnel were considerably greater than Ms. Williams's. They "organized

the blockade, recruited participants, advertised and broadcasted their crime over

social media, made lodging and planning arrangements for the out-of-town

participants, and directed the codefendants on what to do." *Handy* Dkt. No. 574 at

2. Second, the conduct in *Handy* was more serious, involving a forceful pushed

entry into the clinic, the barricading of entrances from the inside, locking staff

inside the facility and preventing patients from accessing the clinic.[4]  Handy and

Darnel thus received 4-point leadership enhancements under USSG § 3B1.1(a),

whereas Ms. Williams only received a two-point enhancement.  A. 1266-A. 1267,

*Handy* Dkt. No. 560 at 11. Third, Handy testified at her trial and was assessed a

---

[4] "Handy and her co-defendants' blockade [of the facility] caused the clinic staff and patients to be 'locked up' inside the facility. . . . clinic patients and staff were barricaded behind closed doors--co-defendants Paulette Harlow and Joan Bell chained themselves together, and along with John Hinshaw, Jay Smith, and Jean Marshall sat in chairs and refused to move; and Heather Idoni and Will Goodman locked their arms and blocked the employee entrance door." Govt. [*Handy*] Reply, Dkt. No. 563, at 2, 4.

two-point obstruction of justice enhancement for apparently lying on the stand. Dkt. No. 563 at 10. This presents a stark contrast to Ms. Williams's circumstances.

The District Court's primary point of comparison was that in *Handy*, like in this case, a person was injured. But the defendant in *Handy* chiefly responsible for the injury, Jay Smith, only received a sentence of 10 months, a term much more commensurate with causing a minor injury. *Handy* Dkt. No. 290, at 2-3 (Gov Sentence Memo); Dkt No. 424 (Judgment). It is clear from the record in *Handy* that the 54-month sentence for Lauren Handy was driven by a number of aggravating circumstances that were not present for Ms. Williams. Appellant's sentence was therefore disproportionately high under the circumstances.

Instead, the Court should have compared Ms. Williams to defendants in FACE Act cases who were more similarly situated. For example, Christopher Moscinski chained the doors of a reproductive health center closed in Long Island and poured glue in the locks so that no one could enter. He also laid across the road to the health center, blocking access, until he was arrested. *See United States v. Moscinski*, 22-CR-485 (JMA) (E.D.N.Y.), Dkt. No. 1 (complaint). Mr. Moscinski was sentenced to six months custody after being convicted at trial. *See Id.* Dkt. 33. Chester Gallagher was convicted of violating the FACE Act in the Middle District of Tennessee and was sentenced to 16 months' imprisonment. *See United States v. Gallagher*, 22-Cr-327 (M.D.Tenn.), Dkt. No. 3 (Indictment); No.

49

782 (Judgment). Gallagher was the leader of a conspiracy involving at least ten co-defendants and the organizer of a blockade at a reproductive health clinic in Mount Juliet, Tennessee, where he and co-defendants blocked the entrance to the clinic, keeping patients and employees from entering, until the coconspirators were finally arrested. Gallagher organized the blockade, advertised it online, recruited participants, live-streamed it while it was occurring, and participated. Dkt. No 3.

In certain respects, Ms. Williams's case was less serious. Even though she received two leadership points for directing other protesters, she was not the kind of organizer or leader Gallagher was. She was not the head of a conspiracy and she was acquitted of the conspiracy charge in her case. Nor did she lock the doors to the Manhattan clinic or actually prevent people from entering or leaving, like both Moscinski and Gallagher did. On the other hand, she was found to have caused a minor injury, which sets her apart from these two cases, but that distinction hardly warranted an increase of three years in prison from Moscinksi's sentence, or even two years from Gallagher's sentence. [5]

It is true that Ms. Williams received a guideline sentence. But as the Court has stated, a "sentence within the properly-calculated Guidelines range can be substantively unreasonable." *United States v. Pugh*, 945 F.3d at 27. The guideline

---

[5] If the NYPD Officers had arrested Ms. Williams on June 20, 2020, she almost certainly would have been charged with misdemeanor assault and likely would have received no jail time.

range here was artificially high, for two reasons. First, it was driven by the aggravated assault cross reference, based on the theory that Ms. Williams used the entrance door to the clinic as a "dangerous weapon" to purposefully inflict injury. *See* A. 1265-A. 1266. However, the aggravated assault guideline is a blunt instrument – it can cover a fairly unserious assault, and it can cover a stabbing. Ms. Williams's guideline would have been the same had she beaten Ms. Verrilli with a baseball bat or sliced her arm with a knife. As the transcripts and videos of the incident show, Ms. Verrilli's hand was stuck in the door for about 10 seconds. A. 658. *See also* GX 191. Ms. Verrilli did not seek medical attention on the day of the incident. A. 665-A. 666. She did not call 911. She carried on with her duties at the clinic. No one suggests that getting a hand caught in a door is a pleasant experience, but it also does not compare to far more serious aggressive assaults that nevertheless are treated the same under this guideline.[6]

Second, Ms. Williams was assessed a Criminal History Category of III, which substantially overstated the seriousness of her prior criminal convictions. The Court calculated Ms. Williams's criminal history as follows:

---

[6] Edmee Chavannes, Ms. Williams's co-defendant who protested alongside Ms. Williams, was acquitted. A. 1180. What likely set her case apart was that Ms. Williams was found to have caused bruising to Ms. Verrilli's hand when she pushed for ten seconds against the entrance door of Planned Parenthood while Ms. Verrilli's hand was stuck in the door. In other words, a ten second push resulting in a bruised hand led here to a 41-month separation of a young mother from her two-year-old child. That is not a just or fair result.

51

- One criminal history point for a 2011 misdemeanor shoplifting conviction (NY Petit Larceny), when she was 20 years old. She was sentenced to 8 days of community service. A. 1228. [*See also* PSR ¶ 58.]

- One criminal history point for another misdemeanor shoplifting conviction in 2011, when she was still 20 years old. She received a sentence of a 1-year conditional discharge. *Id.* [*See also* PSR ¶ 59.]

- One criminal history point for a 2013 attempted grand larceny, where she rang up $5000 worth of merchandise at Bloomingdales but ultimately left the store without taking anything. She was sentenced to five years' probation, which she finished early after three years. *Id.* [*See also* PSR ¶ 61.]

- One criminal history point for a 2022 misdemeanor trespassing conviction related to her protest outside of a Planned Parenthood in Tennessee. She was sentenced to a 30-day suspended sentence. *Id.* [*See also* PSR ¶ 62]

These four convictions led to four criminal history points, and a category of III.

But these were not serious cases. The first two convictions involved shoplifting,

nine years before the criminal conduct in this case (only one year short of not

counting at all). They can hardly be considered serious and took place when Ms.

Williams was very young. Her third conviction, a low-level felony, was also

related to an attempted theft from a store, and Ms. Williams never actually took the

merchandise. *See* PSR at ¶ 61. Her last conviction related to her protest activities

and took place two years after the count of conviction here (although before her

arrest). She received a suspended sentence for trespassing.[7] These convictions

---

[7] The District Court appears to have mistaken Ms. Williams's sentence as "30 days in prison." A. 1270.

were exceedingly minor, yet drove Ms. Williams's guideline to level III, which renders it equal to the criminal category of someone who committed a serious felony and spent several years in prison. Ms. Williams, to the contrary, had never spent more than a few days in jail. Her criminal history therefore overstated the seriousness of her criminal record.

Not only did her criminal history overstate the seriousness of her prior criminal record, but the District Court appeared to attach more weight to that record than it deserved, referencing Ms. Williams's "seven" prior convictions as an aggravating factor.[8] A. 1304. The harm here was therefore twofold. First, the inflated criminal history category drove up Ms. Williams's guideline range from 30-37 months (level 19, CHC I) to 37-46 months (level 19, CHC III). Second, the Court's misguided view of Ms. Williams's criminal record likely impacted the final sentence.

As Judge Parker recently observed, it is "difficult to say with any confidence what is, or should be, considered conscience-shocking when navigating a criminal justice sentencing regime that is arguably among the most punitive in the developed world." *United States v. DiMassa*, 117 F.4th 477, 493 (2d Cir. 2024) (Parker, J. dissenting). The District Court's sentence of 41 months, so out of line

---

[8] The District Court appeared to be referring to two additional convictions that occurred when Ms. Williams was 17 years old (joy riding and shoplifting) for which she received no criminal history points because the convictions were too old. *See* PSR ¶¶ 56, 57.

with sentences imposed for most other protesters at reproductive health clinics and thus disproportional to similarly situated defendants, as well as based on an inflated guideline range – simply cannot "bear the weight assigned to it under the totality of circumstance in th[is] case." *Cavera*, 550 F.3d at 191. Accordingly, this Court should hold that the sentence was substantively unreasonable.

54

## **CONCLUSION**

For the reasons stated in Point II above, Appellant respectfully requests that this Court vacate Ms. Williams's conviction and dismiss the indictment. In the alternative, for the reasons stated in Point I, Ms. Williams requests that this Court reverse her conviction and remand for a new trial. Also in the alternative, for the reasons stated in Point III, Ms. Williams requests that this Court vacate her sentence and remand for resentencing.

Dated:      New York, New York
December 17, 2024

Respectfully submitted,

‸ʁᶺ'Hʁɋtkᴄp'Oᴋgfᶃn
Florian Miedel, Esq.
Aaron Mysliwiec, Esq.
*Counsel for Appellant Bevelyn Williams*

Miedel & Mysliwiec LLP
52 Duane Street, 7th Floor
New York, New York 10007
212-616-3042
fm@fmamlaw.com

55

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,459 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in Microsoft Word using a proportionally spaced typeface (Times New Roman), size 14 point.

Dated:      New York, New York
            December 17, 2024

                              Respectfully submitted,


                               ͽ√˄Ħɧtkɔp'Ὸ kɡf gn
                              Florian Miedel, Esq.
                              Aaron Mysliwiec, Esq.
                              *Counsel for Appellant Bevelyn Williams*

                              Miedel & Mysliwiec LLP
                              52 Duane Street, 7th Floor
                              New York, New York 10007
                              212-616-3042
                              fm@fmamlaw.com

56